UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PLEASANT SEA VIEW, INC.
d/b/a CERTIFIED SALES
vs. C.A. No. 05-CV-281-ML
BLACKADAR MARINE INSURANCE
AGENCY, INC.

DEPOSITION OF 30(b)(6) witness Ronald Bethel, a Witness in the above-entitled case, taken on behalf of the Defendant, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Goldenberg & Muri, LLP, 10 Weybosset Street, Providence, Rhode Island on March 7, 2006 at 11:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF......SAUNDERS & SAUNDERS, LLP
BY: NORMAN A. PELOQUIN, II ESQ.
700 PLEASANT STREET
NEW BEDFORD, MA 02740

FOR THE DEFENDANT......TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
BY: LEONARD W. LANGER, ESQUIRE
THREE CANAL PLAZA
PORTLAND, ME 04112

ALSO PRESENT: Martha Blackadar and Donna Duermyer

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

Page 62

A. Yes, their -- wife and girlfriend.
Q. To your knowledge, did Robert and Brian use the Ocean on a regular basis for their own purposes?
A. Not on a regular basis. Occasionally, but not on a regular basis.
Q. Was the Ocean owned by Certified Sales or by some other company?
A. Owned by Certified Sales.
Q. So, other than the brief conversation you had with Brian telling him that the boat needed to be covered while he used it over Labor Day weekend, did you discuss anything else with him at that time?
A. Not that I can remember.
Q. Does Certified Sales or Pleasant Sea View, Inc., maintain copies of its telephone bills?
A. I would imagine so.
Q. Who would know that?
A. If I need to get a copy of a phone bill, I call Sandy.
Q. So, Sandy would maintain the office record and so on?
A. Yeah.
Q. If you needed something out of the files, you would call her and she would get it for you?

Page 63

A. Usually, yeah.
Q. Do you know where what's been marked as Exhibit 4 came from, which file?
A. I don't know. Brian sent it, so Brian must have had it.
Q. Okay. To your knowledge, Mr. Bethel, did Certified Sales, Inc., or Pleasant Sea View, Inc., ever receive any response to what has been marked as Exhibit Number 4?
A. I have no idea.
Q. Did you ever have any conversations with anybody at Blackadar about insuring the Ocean?
A. Other than that, I might have said to Al at one time, I want to make sure this thing is covered.
Q. Do you have a specific recollection of any conversation you had with Al Blackadar?
A. No.
(BRIAN BETHEL ENTERED AT THIS POINT)
MR. PELOQUIN: For the record, Brian Bethel is here.
Q. So, just to finish up on the last question, you have no specific recollection of ever talking to Al Blackadar about the Ocean?
A. No. Dates, times, no.

Page 64

Q. Do you have any specific recollection of any conversation at any time with Al Blackadar about the Ocean?
A. He knew we had it, and I mentioned it. That was it.
(DEFENDANT'S EXHIBIT 5 MARKED FOR IDENTIFICATION)
Q. Mr. Bethel, let me show you what's been marked as Exhibit Number 5 and ask if you can identify that document?
A. It's a letter I must have got from Al in 1997.
Q. Do you have any recollection of that document?
A. It refers to a conversation, and I can't tell you what that was.
Q. Okay. Do you recall giving a presentation at a Sam's conference?
A. I've given a ton of them.
Q. Do you remember Mr. Blackadar recommending to you that the limits at the various locations be increased from what they were?
A. We talked about that time to time.
Q. Do you remember calling his office and telling him that you didn't have all the boats that were listed on the website or in your inventory and you

Page 65

didn't want to raise the limits?
A. I don't remember that conversation.
Q. Do you have any reason to believe that you didn't receive this letter?
A. No. I have no reason to believe I didn't receive it.
Q. There's some handwriting in the lower right-hand corner that says "11-4, Ron called. He doesn't have all these boats - most are listings highest value is $130,000." To your knowledge, is that an accurate recitation of the conversation you had?
A. It could have been.
Q. In November of 1997, was the highest value boat you had at either location $130,000?
MR. PELOQUIN: If you know.
A. The highest value of a boat that might have been an accumulation of boats, I don't know.
Q. Does Certified Sales or Pleasant Sea View, Inc., maintain records of what boats it has at what locations at any one time?
A. Not really. I mean, I have records showing boats all over the place, but --
Q. So there's no central inventory that you maintain to let you know what boats you have and their values at any one time?

Page 78

A. From about 1987, '88 even through today.
Q. And what type of business do you do with John Deere Credit?
A. Repossession of assets.
Q. Do you -- have you ever bought vessels from John Deere Credit?
A. A lot of time the stuff goes through Certified's name. Whether we actually buy it or don't buy it, it ends up going through Certified.
Q. Did you ever borrow any money from John Deere Credit?
A. I don't believe so.
Q. Did you ever recall requesting a certificate of insurance from Blackadar Marine for John Deere Credit reflecting boat dealers and motor cargo coverage?
A. I may have.
Q. Would that be something that you would request or that Sandy would request in your office?
A. Oh, Sandy, I, Brian.
(DEFENDANT'S EXHIBIT 12 MARKED FOR IDENTIFICATION)
Q. Let me show you what's been marked as Exhibit Number 12 and ask if you recall ever seeing that document.

Page 79

A. I can't honestly say if I saw it or not.
Q. Do you recall whether there was any sort of deal or loan from John Deere Credit to Certified Sales at that time?
A. No. We probably had some of their collateral and they wanted to make sure we had some insurance.
Q. You don't recall any conversations you had with anybody at Blackadar Marine in January of 2001 regarding John Deere Credit?
A. I don't remember.
(DEFENDANT'S EXHIBIT 13 MARKED FOR IDENTIFICATION)
Q. Mr. Bethel, I show you what has been marked as Exhibit Number 13, ask if you recognize that letter?
A. I must have told Erin to call back and say that was the only boat at the docks.
Q. The question is, do you recognize this letter?
A. I don't recognize the letter.
Q. It's a letter from Blackadar Marine to you --
A. Yes.
Q. -- regarding the Ocean?
A. Yes.
Q. The fax number, 401-737-0200, is that the Warwick,

Page 80

Rhode Island fax number?
A. Yes.
Q. Do you recall asking Blackadar Marine to increase the boat dealers' limit on Certified Sales' policy to $250,000 in June of 2001?
A. I may have.
Q. Do you recall seeing -- receiving a recommendation from Blackadar that possibly 250 was not enough?
A. That's what this says.
Q. Did Erin work for you in June of 2001?
A. Yes.
Q. Do you recall having a conversation with Erin in which you told her that $250,000 coverage was adequate or words --
A. As I said, we probably only had one boat at the dock at the time and that would have been that boat.
Q. The question is, do you remember having a conversation with Erin?
A. I don't remember the conversation with Erin.
Q. Do you have any reason to believe that Erin didn't call Blackadar --
A. No. I have no reason to believe she didn't.
Q. Do you know or is there any way for you to determine the value of the inventory at Warwick in

Page 81

June of 2001?
A. No.
Q. Do you have any specific recollection of a conversation either with Donna Duermyer or with Al Blackadar or anybody else at Blackadar Marine regarding the Ocean in June of 2001?
A. No.
Q. Would there be any inventory of vessels at the Mendon location at any time from 1994 to the present?
A. To the present? Presently there is.
Q. What about before July of '03?
A. The only thing there would be would be a list of everything that's for sale, and it wouldn't state where things were.
Q. But in actuality, did Certified Sales or Pleasant Sea View store any vessels at the Mendon location?
A. Yes.
Q. Prior to July of '03?
A. Yes.
Q. Were there any vessels stored there in June of '01?
A. Yes.
Q. Would you have any way of knowing or determining the value of the inventory that was maintained at

Mendon at any point in time?
A. By schedule, no. What we believed in our mind, yes, that's all.
Q. So if I asked you what the value of the inventory of Mendon was on June 29, 2001, could you tell me?
A. I couldn't tell you.
Q. Referring again to Exhibit 13, the letter, I read, it says, "We have advised the company to increase the boat dealers' limit on your policy to $250,000 to cover this boat." Do you recall telling anybody at Blackadar that the value of the 48-foot Ocean was $250,000?
A. I don't know. Everything seems to go up in even numbers. So I might have said we've got close to that in it or something. But that was the only boat, to my knowledge, at the time.
Q. Did you believe the boat was worth $250,000?
A. Oh, yes.
Q. Was that just based on your own experience and knowledge?
A. Yes. And general market conditions at the time, the boat was worth 250,000.
Q. Do you have a copy, to your knowledge do you have a copy of correspondence from Blackadar Marine such as Exhibit 13 in the company's files?



A. Not that I know of.
Q. Why doesn't Certified Sales or Pleasant Sea View maintain this type of correspondence?
A. Anything that had to be saved ended up in Mendon. In 1994 up until the last couple of years, that whole property in Rhode Island was under construction. Things got moved several, several times. In fact, my office isn't even my office anymore since this last hurricane, so I don't know where I sit. So where would records be today? I'd have to go back there and look and I haven't been there for a long time.
Q. I think you said earlier this morning that you would meet on sort of an annual basis with Al Blackadar to review the insurance coverages for Certified Sales?
A. Well, we'd have casual meetings from time to time, lunch, he'd come down or I'd meet him some place around Mendon or at Mendon we'd go have lunch or he would stop down and have lunch or if he was in the area driving by he would stop by.
Q. Did you maintain any sort of records or notes of those meetings?
A. No.
Q. In July of 2002 Al Blackadar and Marty Blackadar



came to visit you in Warwick, Rhode Island?
A. Correct. Some time in the summer.
Q. And one of the purposes of their visit was to talk about the insurance coverage for Certified Sales and Pleasant Sea View?
A. Yes. But I think that was secondary to the fact that Al was not well and it was -- he felt that he wanted to introduce me to his wife and say there may be a -- change in leadership.
Q. Was that the first time you ever met Marty Blackadar?
A. I don't know.
Q. Do you maintain any notes of that meeting?
A. No.
Q. It took place at Warwick?
A. Yes.
Q. Do you know, did it take place in your office or in the restaurant or on a boat?
A. I can remember sitting in the restaurant having lunch or something like that.
Q. How long did the meeting last?
A. Lunch? Half hour, 45 minutes.
Q. Do you recall during that meeting that either Al or Marty Blackadar recommended to you that you increase the limits at the Warwick facility to



$500,000?
A. I don't remember that number.
Q. Do you remember any number that they recommended to you?
A. They were always recommending more and more. They're selling insurance.
Q. And do you recall what the limit at Warwick was in the summer of 2002?
A. No, I don't know. I don't know if it was -- what it was.
Q. Do you remember -- strike that. Other than yourself and Al and Marty Blackadar, was anybody else present?
A. No.
Q. Did you in fact agree at that meeting to increase the limit?
A. I may have.
Q. Do you remember telling either Al or Marty Blackadar that 500,000 coverage was way too much?
A. At that time, I may have said that.

(DEFENDANT'S EXHIBIT 14
MARKED FOR IDENTIFICATION)

Q. Mr. Bethel, let me show you what's been marked as Exhibit 14. Do you recall receiving a two-page letter from Blackadar Marine dated August 8, 2002?

Page 86

A. Yeah, I remember seeing this thing. I remember talking about the restaurant thing.
Q. In fact, Exhibit 14 is sort of a recap of the meeting you had with Al and Marty Blackadar on July 22nd of 2002 at Warwick; is that correct?
A. Could be.
Q. And in the second paragraph down there is a note that the boat dealers' limit was going to be increased from 250 to $300,000 at Warwick and that the premium would be $351 more; is that correct?
A. Yup.
Q. Does that refresh your recollection as to whether you finally authorized an increase in the amount of the coverage from 250 to 300,000?
A. I must have.
Q. Does that refresh your recollection as to any other part of the conversation you had with either Al or Marty Blackadar regarding the limits on the Warwick location?
A. No.
(DEFENDANT'S EXHIBIT 15 MARKED FOR IDENTIFICATION)
Q. Let me show you what's been marked as Exhibit 15. Do you recall receiving Exhibit 15 which is a letter dated August 16, 2002 from Blackadar Marine

Page 87

to you at the Mendon location?
A. I usually just get a phone call, hey, we got a bill, does that sound right and that's it. I mean, I don't remember seeing this exactly. No.
Q. I think you testified before that it was the practice at Mendon and Warwick that when new policies or binders would come in, many times they just got put in the file?
A. That's right.
Q. In your opinion, was $300,000 adequate coverage for the inventory in Warwick on August 8, 2002?
A. August 8, 2002? Yes.
Q. Or in August of 2002?
A. Yes.
Q. Do you know what the value of the vessels or the inventory of vessels at Warwick was in August of 2002?
A. I think there was one small boat and the Ocean, possibly. The Ocean was always there.
Q. Do you recall having any other conversations with anybody at Blackadar Marine between the time you met with Al and Marty and either the letter dated August 8 which is Exhibit 14 or the letter dated August 16 which is Exhibit 15?
A. I don't remember.

Page 88

Q. Do you remember having any conversations with anybody else at Certified Sales or Pleasant Sea View during the summer of 2002 regarding insurance coverage at either the Warwick location or the Mendon location?
A. No.
(DEFENDANT'S EXHIBIT 16 MARKED FOR IDENTIFICATION)
Q. Let me show you what's been marked as Exhibit 16 which is a letter dated September 18, 2002 from Blackadar to you at the Mendon location. Do you recall getting this letter?
A. It looks like -- I don't remember seeing the letter. It may have come with the policy, that's what it says, "Enclosed are your package and marina operators policies." It probably came with a policy.
Q. Do you have any reason to believe the policy wasn't enclosed in this letter?
A. The policy was probably closed with the letter.
Q. Is it, in your opinion, more likely than not that the policy would have been taken and put in the file at Mendon?
A. Yes.

Page 89

(DEFENDANT'S EXHIBIT 17 MARKED FOR IDENTIFICATION)
Q. Let me show you what's been marked as Exhibit 17. I represent to you that it is a hull policy declarations for Certified Sales, d/b/a Pleasant Sea View, 1-2 Bay Road, Warwick, Rhode Island for the policy year 3, 2002 to August 3, 2003 as issued by Great American Companies Insurance. Do you recall reviewing this document when it was received by Certified Sales?
A. I don't remember reviewing it, no.
Q. To your knowledge, would anybody else at Certified Sales or Pleasant Sea View have reviewed it upon receipt to make sure that the coverages were what you thought they should be?
A. Probably the first page.
Q. And that was to determine that there was a bill of $7,075?
A. Yeah.
Q. Would you -- strike that. Would Sandy have authority to pay that type of a bill without talking to you?
A. Yes, she would.
Q. And to your knowledge, was the bill for the policy paid?

Q. Do you know what sort of additional premium was charged by Blackadar for the additional coverage that was provided?
A. No.
Q. Did you ever see any policies that were issued for either the Ocean or the Sunseeker?
A. No.
Q. Are you aware of any checks that were written to Blackadar for additional coverage?
A. No.
Q. After the individual at Great American told you there was only $300,000 of coverage, did you go back and look at the policies?
A. I don't know if I looked at the policy that day or not. I probably did at some point because I remember seeing the policy in my file afterward.
Q. What did you determine from reviewing the file?
A. I just believed what he said.
Q. Did you call Blackadar at any point after the fire and ask them about coverage?
A. I don't remember.
Q. Did you have more than one conversation with anybody at Great American?
A. I might have talked to them a couple times about it. I think I did. I think I did.



(DEFENDANT'S EXHIBIT 31
MARKED FOR IDENTIFICATION)
Q. Do you recall anything more about the conversations you had with the individual other than his telling you there was only 300,000 of coverage?
A. I think that he said that they were -- he might have called me and said something about Jonathan Klopman was going to be assigned to it and work along with the fire investigators and he would be in touch with me and then we might have -- I think we talked again about when I could get the check or what they had to go through and how the process would be.
Q. Had you known John Klopman before?
A. Yes.
Q. He's a marine surveyor?
A. Yes.
Q. If I suggested the individual you were talking to at Great American was Carl Hees?
A. Right.
Q. That's the individual?
A. Yes.
Q. Let me show you what's been marked as Exhibit 31. Do you recognize that document?



A. Yes.
Q. That's a four-page document. What is the document?
A. It's a list of the loss, I think. And it shows the recovery costs getting them out of the water. It talks about the Nelson Marek.
Q. Is this the claim that you filed with Great American?
A. Yes.
Q. You, being Certified Sales?
A. Yes.
Q. The last page is a diagram?
A. Yup.
Q. Is that a diagram you prepared?
A. Yes.
Q. And it shows the location of the vessels at the time of the fire?
A. Correct.
Q. Did you prepare the letter marked as Exhibit 31?
A. Yes.
Q. And that's your signature on Page 2?
A. Yes.
Q. Now, on Page 1, and I apologize for not having more than one copy, but it reflects a value on the Sunseeker of 348,795.69?



A. Yes.
Q. Can you tell me where that value came from?
A. That was the purchase of the boat, plus the cash outlay, not including the labor involved that we have record of.
Q. You have documents that supported that?
A. That was the figure that I got from Mendon.
Q. Did you ever see any documents to support that number?
A. Well, I know it was bills Sandy paid, so. These were actual bills here.
Q. And the Ocean value of 77,329.56, that's the estimate with the --
A. Estimated repair from Onset Bay Marine.
Q. With the 10 percent tack-on?
A. Yup.
Q. Now, Certified Sales had $100,000 deductible on its policy -- $1,000 deductible, excuse me?
A. 1,000.
Q. It's getting late. As a result of your claim, Great American forwarded to you a check in the amount of $299,000?
A. Most likely. I can't remember seeing the check. I'm sure it came in.
Q. You also made a claim for various clean-up costs

Page 134

and so on?
A. Right.
Q. To your knowledge, was that paid?
A. That was paid.
Q. And you also made a claim of 65,000 for damage to the Nelson Marek as a result of the fire?
A. Correct.
Q. And was that paid?
A. No.
(DEFENDANT'S EXHIBIT 32 MARKED FOR IDENTIFICATION)
Q. Let me show you what's been marked as Exhibit 32 and ask you if you recognize that document?
A. Yes.
Q. That's a letter from Carl Hess to you?
A. From Carl, yes.
Q. Explaining Great American's position with regard to the loss?
A. Right.
Q. What's the date of that letter?
A. September 15, '03.
MR. LANGER: Quick turnaround for an insurance company.
THE WITNESS: That was very good, that's what I was looking at.

Page 135

MR. PELOQUIN: I have a different date. Same letter, different date.
MR. LANGER: Is yours earlier or later?
MR. PELOQUIN: Later. The 18th.
Q. Now, I refer you again, Mr. Bethel, to Exhibit 29 which are Plaintiff's Answers to Interrogatories. On Page 7, you're seeking -- Interrogatory Number 26 which sets forth the plaintiff's computation of damages in this case; is that correct?
A. Yup. Yup.
Q. You are showing that the original purchase price of the Sunseeker is $330,000 and then there were 1,545 for closing costs. Do you believe closing costs are an insured item?
THE WITNESS: Are they an insured item?
Q. In your experience, are the costs of buying a vessel usually included and covered by an insurance policy?
A. I've dealt with a lot of insurance.
MR. PELOQUIN: I'm going to ask the relevance of that question in connection with this case. Stop. It's an item of damage in this case.
Q. Why do you think the closing costs are an item of

Page 136

damage in this case?
A. Because it's part of the cost of the vessel.
Q. Is it your understanding that the insurance policy provided by Great American would have covered the closing costs had there been a higher limit?
A. Yes.
Q. Do you believe that the insurance policy provided by Great American would have covered loan interest on the vessel?
A. Yes.
Q. And do you believe that the insurance policy would have covered cleaning and parts?
A. Yes.
Q. In your complaint in this matter, and I'll read you Paragraph 5, it states, "Blackadar agreed orally with Certified Sales that in consideration of plaintiff's insurance business, past and future, and in further consideration of the fees and/or commissions to be received by defendant for procuring the aforesaid insurance to procure and maintain proper and adequate liability and property insurance including sufficient coverage to protect its inventory." Quote. Is that your position in this case?
A. Yes.

Page 137

Q. Now, when you said Blackadar agreed orally, what specific oral representations did Blackadar make upon which you claim Certified Sales relied upon?
A. Over the years, Al Blackadar and I had a very good business and personal relationship, I felt, and we would discuss things on a regular basis. That relationship with Blackadar Marine Insurance passed with his passing.
Q. How did it change between the time you stopped dealing with Al Blackadar and July 2nd, 2003 if at all?
A. I talked to Al a lot.
Q. About insurance?
A. About insurance, on insurance for other people. He would even call me when he went to a conference and would learn things about the insurance industry, and we'd talk about them. So we had a pretty good business and personal relationship.
Q. Did you ever find instances where you thought that he had not provided you with the coverage that you had wanted?
MR. PELOQUIN: Is this prior to the fire?
MR. LANGER: Prior to July of '03.

Page 138

A. Prior to the fire, I would say no, I felt comfortable with it. I felt comfortable with him as my agent.
Q. Did you -- prior to July of '03 did you feel comfortable with Marty Blackadar as your agent?
A. Never had much conversation with Marty Blackadar, other than that meeting we had that summer when he was kind of transferring things.
Q. Did you always follow Al Blackadar's advice as to the insurance that he thought Certified Sales ought to carry?
A. We would discuss the values. He would -- we would go back and forth until we came to something that we both felt comfortable.
Q. There were times, in fact, he recommended that you increase your coverage where you ultimately didn't follow his advice; is that true?
A. Yes. But I also never decreased my coverage.
Q. Paragraph 13 of the complaint states that "Blackadar notified Certified Sales that the 62-foot Sunseeker and 48-foot Ocean were not fully covered by insurance and that the total limit of coverage for damage or loss of the inventory in Warwick was $300,000." That in fact was -- notification was provided by Carl Hees at Great

Page 139

American, not Blackadar, isn't that true?
A. Yes, I think so. The number is the same.
Q. The issue is you got that information from Great American, not from Blackadar?
A. Yes, my first --
MR. PELOQUIN: What's your memory?
A. My memory as of today it was then, that conversation I was sitting at my desk that's when I went --
Q. That was with Carl Hees?
A. Carl Hees.
Q. Do you recall any statements made by Blackadar Marine with regard to either the fire or the coverage provided by Great American at any time from July 2 of 2003 until today?
A. I don't recall. I know that a lot of phone calls were made right after the fire, and I may have talked to Blackadar Marine. Most likely, I must have notified them. I mean, the contents of those conversations at that point were just --
Q. You have no recollection of the specific content of the conversations?
A. No.
Q. Did you ever -- did Certified Sales or Pleasant Sea View ever maintain any insurance on either the

Page 140

Nelson Marek, the Ocean or Sunseeker with anyone other than Great American?
A. No.
Q. How long was the Nelson Marek at Warwick prior to the fire?
A. Average turnaround is six weeks. So, I'll use that as an average. I don't know exactly but average turnaround on assets are six weeks.
Q. The 59-foot Fairline, 1994, referenced in Exhibit 26, was that also in Warwick?
A. No.
Q. Where was that located?
A. I think that was an off-site sale.
Q. What about the 30-foot Donzi 2000.
A. I don't know where it was.
Q. The Cobia 2001?
A. I think that was in Mendon.
Q. Has Pleasant Sea View or has Certified Sales made any claims against anyone else other than Great American and Blackadar with regard to the fire on July 2nd?
A. No.
Q. Have you described for me as best you can recall all of the conversations you had with Blackadar with regard to insurance on the Ocean or the

Page 141

Sunseeker from January 1 of 2003 to the date of the fire?
A. I think so.
Q. Have you also relayed to the best of your recollection the conversations you had with anybody at Blackadar with regard to insurance on the Warwick location from 2000 up until the time of the fire?
A. I think so.
Q. Have you related as best you can recall all communications with Blackadar Marine during the closing on January 17, 2003?
A. Yes.
MR. LANGER: I think I'm just about done. I'm going to take a break for a couple minutes.
(BRIEF RECESS)
MR. LANGER: I don't have any more questions today. The deposition will continue tomorrow with regard to the corporate entities and also with regard to Mr. Bethel, we'll keep it open because I don't believe we have all the documents that we've requested and to the extent that any of those documents reflect any additional areas of questioning, I reserve the right to call him back